186 P.2d 485

## STATE v. GOLDEN.

### No. 7371.

Supreme Court of Idaho.

Nov. 10, 1947.

Rehearing Denied Dec. 4, 1947.

498

Phil J. Evans, of Murphy, for appellant.

Robert Ailshie, Atty. Gen., and J. R. Smead, Asst. Atty Gen., James W. Blaine, Pros. Atty., and Grant L. Ambrose, Deputy Pros. Atty., both of Boise, for respondent.

BUDGE, Chief Justice.

We will hereafter refer to appellant as defendant.

Defendant was duly charged with the crime of murder of the first degree in the following language: "That the said defendant, Ralph Golden, on or about the 30th day of September, 1946, in Ada County, State of Idaho, then and there being, did then and there wilfully, unlawfully, knowingly, feloniously and with malice aforethought, and with intent to kill and murder one Mildred L. Rusho with a .25 caliber revolver, then and there held in his, the said Ralph Golden's hand, and that the said defendant, Ralph Golden, then and there wilfully, unlawfully, knowingly, feloniously, and of his own deliberate and premeditated malice, did by shooting with intent to kill as aforesaid, mortally wound her, the said Mildred L. Rusho, from which mortal wound, the said Mildred L. Rusho, on or about the 30th day of September, 1946, did die."

The cause was tried before the court and jury of the Third Judicial District, for Ada County. Defendant was found guilty as charged in the information, and sentenced to imprisonment in the state penitentiary for life, as fixed in the verdict of the jury.

Defendant served and filed his application for new trial, which was denied, whereupon

an appeal was taken from said order, and from the judgment of conviction.

▇ Chapter 12, Sess. Laws 1937, amending sec. 19-2705, I.C.A., provides an appeal from a judgment in a criminal case must be taken within 30 days after its rendition. The judgment herein was entered December 23, 1946; the appeal was taken April 12, 1947. The appeal from the judgment not being taken within the time fixed by statute, is not here for consideration.

In defendant's application for new trial four grounds are set forth, each containing several subdivisions. The first ground is, that the court misdirected the jury on matters of law, and is predicated upon instructions Nos. 12, 13 and 14.

Instruction No. 12 reads, in part as follows:

"The State does contend that the killing of Mildred L. Rusho was a wilful, deliberate and premeditated murder, and that it was committed in the perpetration of, or attempt to perpetrate, robbery.

"Robbery is by our statute defined as

" 'The felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.' "

Defendant gave as reason therefor that the court did not, in the instruction complained of, nor in any instruction given, state the converse of the State's theory as expressed in said instruction. In other words, that the court did not instruct the jury that the defendant did not commit robbery, or attempt to commit robbery, therefore the instruction was highly prejudicial and constituted reversible error; that said instruction was bound to impress the jury that defendant did admit committing a robbery or attempting to commit a robbery, and that there is no evidence in the record that defendant committed a robbery or attempted to commit a robbery on the premises.

When defendant was arraigned he entered a plea of "Not Guilty", that is, that he did not murder Mrs. Rusho as charged in the information, or at all. Furthermore, in instruction No. 3 the court instructed the jury as follows:

"To this Information the defendant has entered his plea of 'Not Guilty.'

"This puts in issue every material allegation of the Information, and makes it incumbent upon the State, before you can convict the defendant of any offense, to produce evidence establishing beyond a reasonable doubt that the defendant is guilty of such offense.

"He is presumed to be innocent unless and until the evidence produced upon this trial justifies beyond a reasonable doubt the belief that he is guilty of some offense charged against him in this Information."

▇▇ From a reading of this instruction it will be observed the court instructed

the jury that defendant contends he did not murder Mrs. Rusho while committing, or attempting to commit, a robbery, but that defendant contends that he did not kill her at all, and he is presumed innocent until he is proved guilty beyond a reasonable doubt. The theory of the defense was clearly and definitely presented to the jury upon this point. 23 C.J.S., Criminal Law, § 1190. "The plea of not guilty * * * controverts the existence of every fact essential to constitute the crime charged." Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 357, 40 L.Ed. 499.

■ Defendant contends the instruction is erroneous for the reason there is no competent evidence in the case that said homicide was committed in a robbery, or in an attempt to commit robbery by defendant. If the evidence, beyond a reasonable doubt, supported the charge that defendant murdered Mrs. Rusho as charged in the information, the fact that he did not so murder her in the commission of the crime of robbery, or in an attempt to commit robbery, would not justify a reversal of the judgment. State v. Reding, 52 Idaho 260, 13 P.2d 253. However, there was sufficient substantial and competent evidence for the consideration of the jury from which it was their duty to determine whether or not Mrs. Rusho was murdered in the commission of the crime of robbery, or an attempt to commit robbery, or as charged in the information. Oral and documentary evidence established the fact that the two bedrooms in the house had been ransacked, both the dressing table in the east bedroom and the bureau in the west bedroom had been disturbed, the contents scattered about, the purses open and empty, and other pertinent evidence supported the theory of the State that the murder was committed in the commission of robbery or an attempt to commit said crime.

■ Robbery, or an attempt to commit robbery, standing alone, would not be sufficient to establish that defendant murdered Mrs. Rusho, but would be a circumstance to be considered by the jury along with other facts and circumstances, its weight, credibility and sufficiency being for the jury.

Defendant contends the court committed error in giving instructions Nos. 13 and 14, which read as follows:

Instruction No. 13

"If, therefore, you are convinced beyond a reasonable doubt, by the evidence in this case, that the defendant Ralph Golden killed the said Mildred L. Rusho, and that he did so kill her with malice aforethought, or by use of a deadly weapon, and wilfully, deliberately, and premeditatedly; or that he did so kill her while he, said Ralph Golden, was committing the crime of robbery, or while attempting to commit the crime of robbery, whether he intended to kill her or not, you should find the defendant guilty of murder of the first degree."

## Instruction No. 14

"It follows, therefore, that the charge against the defendant includes both murder of the first degree and murder of the second degree. And I instruct you that if the evidence produced upon the trial convinces you beyond a reasonable doubt that the defendant did kill the said Mildred L. Rusho, but the evidence fails to show, or leaves a reasonable doubt in your minds, whether he killed her wilfully, premeditatedly and deliberately, and fails to show, or leaves a reasonable doubt in your minds, whether he did so kill her while committing, or attempting to commit robbery, then you can find him guilty only of murder of the second degree.

"In other words, if you are convinced beyond a reasonable doubt that the defendant is guilty, but there is a reasonable doubt in your minds whether he is guilty of murder of the first degree, you can convict him only of the lower degree, that is, of murder of the second degree."

When these instructions are read and considered together with all the other instructions given, they fully state the law applicable to the case. State v. Hansen, 67 Idaho 359, 181 P.2d 192, 195. The various classes of acts are stated constituting murder of the first degree and murder of the second degree under the statute, and the weight and sufficiency of the evidence to establish the crime committed.

We therefore conclude there is no merit in these assignments.

In subd. (d) of the first assignment defendant contends the court erred in giving instruction No. 18a, on the effect of flight. Said specification is directed against the court's refusal to admit in evidence two letters which defendant insists tended to show his reason for leaving the State of Idaho, and to negative the idea that he was fleeing from the state or attempting to conceal his whereabouts.

One of the letters is purported to have been received by Pacific Finance Company, as shown by the testimony of B. H. Brown, branch manager of said company, who testified, among other things, that defendant made application to his company "about six months ago" for a loan, which was granted; that on or about the 1st of October he received a letter from defendant with reference to his account, in which he stated he was going to California to seek employment. Objection was interposed upon the ground that the letter was the best evidence, whereupon defendant's counsel elicited from the witness the fact that he did not keep the letter but destroyed it.

"Q. You made a note on the card that related to Ralph's place of residence? A. Yes. * * *

"Q. But you didn't save the letter? A. I don't have the letter.

"Q. Was it thrown in the waste-basket, and destroyed, or what became of it? A. Yes.

"Q. You may go ahead and state, as near as you can remember, the substance or contents of the letter. A. The letter related that Mr. Golden was going to California * * *"

Whereupon an objection was interposed to any further questions being asked the witness on the ground that the letter, even if it were here, would be a self-serving declaration. The objection was sustained.

■ Conceding, without deciding, that the letter was not admissible for the reason stated, we are not persuaded that the court's ruling constituted prejudicial error, for the reason that the pertinent contents of the letter was testified to by the witness Brown and, in the absence of a motion to strike, remained in the record. Defendant testified, on cross-examination, as to the contents of the letter to the Finance Company:

"Q. I understand you told the Pacific Finance you were going to California? A. I did. Well, sir, what I wrote in that letter I told him,—whether I told him I was going direct to California or not, I couldn't say. I told him I was leaving. I believe I said I was leaving and as soon as possible I would try and straighten up my loan. If I put California in there or said California * * *

"Q. Isn't that where you intended to go? A. California?

"Q. Yes. A. Yes, it is.

"Q. And you left directly for California as soon as you wrote these letters? A. Yes."

The material contents of the letter being disclosed, no prejudicial error resulted by reason of the court's ruling.

Webb Reeves, a witness for the defense, testified that he had conversations with defendant on various occasions prior to the time defendant left Boise October 1st, about his intention, or expressed intention, of leaving Boise, from the time he was on the police department up to the time he left; that defendant told him on several occasions he was unable to make a living here for his family, and he heard they were paying better salaries on the coast, and he was going to the coast, or rejoin the army.

■ The letter written to the First Security Bank, which follows in the same category as the letter to the Pacific Finance company, was not properly identified, therefore not admissible.

It appears that Don Headrick, Sheriff of Ada County, was called as a witness for defendant, whereupon he was asked:

"Q. Mr. Headrick, do you have the letter which the First Security Bank turned over to you? A. I have the letter, but it was delivered to me by one of my deputies. * * *

"Q. I will hand you a letter marked Defendant's Exhibit 'A' and ask you to state if you know what that is? A. A letter

handed to me by one of my deputies, Heath Sebern.

"Q. Do you know where he got it? A. At the First Security Bank."

The letter was thereupon offered in evidence. An objection was made to its admission upon two grounds, first, that there was no showing of any connection between the defendant and the letter, and, second, even if there was, it would be a self-serving declaration. Whereupon the court sustained the objection upon the ground that the letter was not identified. Counsel for defendant stated: "Very well. We will keep that for further identification. That is all for now." Defendant's Exhibit "A", the letter, was not thereafter offered.

No representative of the bank was called to identify the letter, its contents, or the writer. Headrick testified he received it from one of his deputies, who, he said, received it from the bank. The court correctly held it was not properly identified.

Section 16-405, I.C.A., provides that any writing may be proved either (1) by anyone who saw the writing executed; (2) by evidence of the genuineness of the handwriting of the maker; or (3) by a subscribing witness. The court properly sustained the objection on the ground that it was not properly identified, since the proof failed to meet the specifications provided by statute. Beloit v. Green, 43 Idaho 265, 251 P. 621; Doxstater v. Northwest Cities Gas Company, 65 Idaho 814, 154 P.2d 498;

Richmond Dredging Co. v. Atchison, T. & S. F. R. Co. 31 Cal.App. 399, 160 P. 862, 867, citing People v. LeDoux, 155 Cal. 535, 102 P. 517, 523, and Sinclair v. Wood, 3 Cal. 98.

In Jones on Evidence (4th Ed.) Vol. 2, p. 1105, sec. 583, the rule is stated, in effect, that before letters are received in evidence there must be, as in the case of other documents, some proof of their genuineness. This is not proved by the mere fact that the letter is received by mail when the signature is not proved. The same author, in Vol. 4 (2d Ed.) p. 3228, sec. 1756, says there must be preliminary proof of authenticity. The usual mode is proof of handwriting. The mere fact that a letter purports to be written and signed by the person in question is not sufficient to establish its authenticity. (See, also, Wharton's criminal Evidence (11th Ed.) Vol. 2, p. 1393, sec. 808.) Letters which are not shown by any evidence to have been in fact signed by their purported authors, or identified as genuine, are not admissible for any purpose. Buhler v. Loftus, 53 Mont. 546, 165 P. 601, 606.

Specifications of error Nos. 3 and 4, which may be considered together, necessitate a brief résumé of the evidence. Assignment No. 3 states:

"That the verdict of the jury is contrary to law in this:

"(a) That the said jury in arriving at said verdict ignored the instructions of the

court as to the law requiring the state to prove the guilt of the defendant beyond a reasonable doubt.

"(b) That the said jury in arriving at said verdict ignored the instructions of the court requiring them to give the defendant the benefit of any reasonable doubt as to his guilt, and that a reasonable doubt exists as to the guilt of the defendant.

"(c) That the said jury in arriving at said verdict ignored the instructions of the court as to the presumption that defendant was innocent, and requiring them to consider such presumption in weighing the evidence."

Assignment No. 4 states:

"That the verdict is contrary to the evidence in this:

"(a) That there is no evidence in the case showing or tending to show the guilt of the defendant beyond a reasonable doubt.

"(b) That all the evidence in the case is reconcilable with the theory that defendant is innocent.

"(c) That said verdict is based on opinion evidence of little weight, particularly that of Dr. Beeman, testifying as a ballistic expert, who testified on cross-examination that his testimony that the bullets in evidence came from the same gun was not absolute or conclusive evidence of that fact.

"(d) That all of the evidence introduced in the case failed to show any motive for the defendant committing the crime.

"(e) That all of the evidence introduced in the case failed to show any opportunity for the defendant to commit the crime."

In our opinion there was no prejudicial error committed by the court regarding the matters complained of, as will be shown from a brief statement of some of the pertinent facts developed during the trial.

September 30, 1946, at approximately 8:30 p. m., the Ada County Sheriff's office received a call to investigate a body at 73 Pershing Drive, later proving to be the body of Mildred L. Rusho. They found the body lying on the floor in the living room. The deputy sheriff called the sheriff's office requesting them to bring photographic and fingerprinting equipment. Prior to the disturbance of anything in the house photographs of the interior of the house and various objects therein were taken. The officers found, among other things, a broken and jagged bottle top on the floor a short distance from the body; another bottle top on the seat of a platform rocker; also strewn over the rug in the living room, into the entrance of the kitchen and hall, and in the hair of Mrs. Rusho was broken glass, much of it in powdered form. The autopsy revealed that Mrs. Rusho had bruises on the top of her right shoulder, on the upper part of her right arm, right hip, two bruises on her left thigh, ten bruises on the inner part of her right thigh; a bruise on the left knee, and a three inch bruise in the right armpit. From the evidence it is disclosed these bruises could not have been

inflicted after death. The autopsy also revealed that Mrs. Rusho's death was caused by the firing of a bullet from a .25 caliber gun into her head. We have heretofore called attention to the condition of the bedrooms.

It is admitted defendant was employed as a taxicab driver by the Black & White Cab Company, and was so employed the night of September 29, 1946; that he made at least two trips that night to 73 Pershing Drive, the scene of the crime. Whether he made a subsequent trip following the second trip and committed the murder, was a question for the jury to determine from all the facts and circumstances. Defendant was requested to appear at the sheriff's office for questioninig at approximately 1:30 a. m., October 1, 1946, at which time he stated to the officers he had not been inside the house at 73 Pershing Drive when he made his first trip, taking a man by the name of Reed to that address, nor when he returned for Reed that same night about 11:30 p. m. Sheriff Headrick testified:

"Q. Now, during the conversation were questions asked of the defendant as to what his actions had been during that evening? A. Yes.

"Q. Now, was he asked if he had been inside the house at 73 Pershing Drive? A. Yes, he was.

"Q. What was his answer? A. That he hadn't.

"Q. That he hadn't been inside. Was a question asked him whether or not he saw a woman in the house? A. That question was asked, yes.

"Q. What was the answer? A. He at first was unable to answer, but he thought when he handed these cigarettes to the man at the door that he had when he received them spoken to some woman, thought to be a woman, but from his position on the step he was unable to see anyone. We pressed him further in an effort to determine, if possible, the condition of that room at the time that he departed, or who might have been in it, and if anyone was there if they were alive.

"Q. And did you ask him if he knew how this woman was dressed at the time? A. Later in the evening he remarked that he thought she had on a flowered design nightgown or night clothes.

"Q. Was a question asked him whether or not he had seen any whisky bottles in the house? A. Yes.

"Q. And what was his answer? A. That he had observed at least one on the table, a small table on the floor."

At the trial defendant denied making such statements. He remembered clearly when he took Reed out to the Rusho residence they stopped at the Black Diamond Tavern and had a beer, and when returning Reed to his home he testified they again stopped at the Black Diamond and had a beer. All the evidence leads to but

one conclusion, namely, that Mrs. Rusho was alive when the defendant called for Reed about 11:30 p. m., and returned him to his home. When he was returning Reed to his home, the latter mentioned to defendant that Mrs. Rusho's husband was out of town.

October 1st [Mrs. Rusho's body having been discovered about 8:30 p. m., September 30th] the sheriff's office was informed that defendant was seen in the early afternoon leaving Boise, going West; October 3rd the sheriff was advised defendant's wife had received a letter from him, in which he stated he was going East. At or about the same time defendant wrote a letter to the Pacific Finance Company that he was going to California, and the San Francisco police were advised to apprehend him. Stops were placed at each Labor Union in San Francisco, and several construction companies in the Bay region, also at the general delivery window at the San Francisco post office, with instructions to notify Inspector Lee if a person by the name of Ralph Golden called for mail. October 12th Golden called for mail; the clerk told him to wait that some one wanted to speak to him, whereupon defendant immediately left, and did not again call for mail. October 16th Lee received a communication from Brown-Pacific-Maxim Company that a man giving his name as Ralph Golden had sought employment with them on Guam; that he had given his address as 419 Penn Street, Philadelphia, and that he was a member of local draft board 33 there, and his business address as 1048 Market Street, and his wife's address as No. 10 Belgravia; that he was given a form to have his finger-prints taken, but this was never done. He was taken into custody October 17th, in a restaurant where he worked. While he could not give Inspectors Lee and Heeg the names of the various hotels where he had stayed, he was able to give the name of the Grand Southern Hotel, where he registered October 9th, giving his address as New York City, and again October 13th giving his address as Philadelphia. On direct examination Inspector Lee testified as follows:

"Q. Now what did you do when the defendant had been arrested? A. When we arrested him, he immediately said to us, 'What is this all about?' and I said, 'Well, of course, your name is Ralph Golden? Don't you know of anything? Is that you?' and he says, 'Yes, but what's it all about?' I said 'Suppose you tell us. What do you think it's all about? and he thought a moment, and he says, 'Well, I ran out on my wife; possibly she has gotten a warrant out against me,' * * *"

On cross-examination defendant was asked:

"Q. Now, when Mr. Lee and Mr. Heeg apprehended you there, did you tell them that the one thing you could think of was that your wife had you arrested for skipping out on her? A. No, I didn't.

"Q. You didn't say that? A. I did not."

On direct examination defendant explained with minute detail the exact course he took after leaving Boise for San Francisco; the kind of cars he rode in, even the models, about which he was very definite; conversations had with the various people he met, stops made, particularly at Winnemucca; the manner in which the people he drove with were dressed, etc., but, search the record, there is no corroboration of his story.

Inspector Lee testified, on rebuttal, that in defendant's statement of the 22nd he, the defendant, said he came down to San Francisco by bus.

After defendant made his second trip to 73 Pershing Drive his memory fails him as to details. He testified he believes he entered the house, but does not remember whether or not he had a drink; he remembers seeing a woman there, but does not remember whether or not he had any conversation with either Reed or with the woman. Later, on cross-examination, he testified positively that he went into the house, but does not remember how far, or what he did; does not remember being in the room one foot, two feet or three feet, or walking around the room; that he was introduced to Mrs. Rusho, but is not sure, and believes there was some conversation. He does not know whether Reed or Mrs. Rusho offered him a drink, or whether he poured a drink for Mrs. Rusho, or what he drank out of, or where he was in the house or in the room; does not know whether he was in the kitchen or bedrooms, and wouldn't say that he was or was not. He remembered he had a drink, and believes it was whisky; whether he had one, two, three, or possibly 10 or 12, he does not remember, and does not remember whether he was standing or sitting.

On direct examination witness Reed testified:

"Q. Did he give you any cigarettes or anything that he brought with him? A. Two packages, yes, sir.

"Q. When did he do that? A. Directly when he got in there.

"Q. And after he gave you the cigarettes what did he do? * * * A. I introduced him to Mrs. Rusho. I says, 'Mrs. Rusho, this is the taxi driver bringing you the cigarettes,' and she says, 'I thank you; I thank you very much,' and we turned and walked out."

And on cross-examination he gave the following testimony:

"Q. And do you recall definitely whether or not you or Mrs. Rusho or the defendant, or any of you, during the time that he was still there on that occasion, had any kind of a drink? A. No, sir, we had none.

"Q. You are positive about that? A. Absolutely, yes.

"Q. How can you be so positive? A. In fact, Mr. Golden wasn't in there over a

half a minute, and I was ready to go at the time.

"Q. You were all ready to go? A. Yes, sir."

State's Exhibit 15, a bottle neck found on the seat of the platform rocker, was compared with State's Exhibit 44, fingerprints of defendant taken at the time he received his taxicab drivers license. Lt. Brandon, an expert on fingerprinting, testified the fingerprints on State's Exhibit 15 to be the print of the right index finger of defendant.

It might be here observed that the bottle neck upon which defendant's fingerprints were found established the further fact that the bottle was used as a club.

Cresson B. Henderson, a single fingerprint examiner of the Identification Division of the Federal Bureau of Investigation, testified, as an expert, that the palm print appearing on the bottle neck was made by the right palm of defendant as is shown by State's Exhibit 27, a fingerprint card of defendant, and was made by the same person as the palm print pressed on State's Exhibit 16, a bottle neck found on the living room floor. He further testified that he made an examination for the purpose of comparison between the fingerprint appearing on State's Exhibit 19, a photograph of Exhibit 15, with State's Exhibit 27, a fingerprint card of defendant, and found the fingerprint appearing on State's Exhibit 27, which is the right index finger, the same

as that appearing on State's Exhibit 19, and that the same person made both impressions. Defendant admitted that, from his studies while in the Boise City Police Department, fingerprinting is an exact science and a means of positive identification.

Considering all the evidence, there is sufficient competent evidence to justify the jury in finding that defendant was in the Rusho home subsequent to the time he returned Reed to his home; that he handled the whisky bottles in the manner herein referred to, and from the further fact that the body of the deceased was beaten and bruised.

Defendant admitted that he owned and possessed a .25 caliber gun; he further admitted that he fired a bullet from said gun into a telephone pole. It was further established that Mrs. Rusho was murdered by means of a bullet fired from a .25 caliber gun, the muzzle of the gun being held against her skull.

There is a direct conflict in the testimony with reference to when defendant had his gun. He testified he gave it to Erwin Crabtree following a wreck he had with his cab, but has no recollection of having the gun returned to him. Crabtree testified he returned the gun to defendant the same night he received it, and that defendant gave the gun back to Crabtree on the night of the homicide. There is conflict as to the time defendant received

510

the gun from Crabtree upon the second occasion. There is also conflict in the testimony as to when defendant left Nampa on his way to San Francisco.

 There being conflict in the testimony, it was for the jury to determine the facts. State v. Gilbert, 65 Idaho 210, at page 217, 142 P.2d 584, and cases therein cited.

Dr. Beeman qualified as an expert on ballistics. He testified he performed an autopsy on the body of deceased and extracted from her head the bullet found therein, State's Exhibit 29; that he also received into his possession the bullet that defendant fired into the telephone pole, State's Exhibit 30; that he compared scientifically, by modern methods, the two bullets conceded to have been fired from a .25 caliber gun; that from such comparison and examination of the two bullets, in his opinion they were fired from the same gun.

Keeping in mind that questions of law are to be determined by the court, and questions of fact by the jury, secs. 19-1802 and 19-2031, I.C.A., the authority of the jury as to the latter is as absolute as the authority of the court with respect to the former.

 Now referring briefly to the question of flight. Flight would not establish defendant's guilt of the crime charged, it would be but a circumstance. Defendant's departure from the scene of the crime closely following its commission, his contradictory letters, contradictory statements, registering in hotels, as hereinabove indicated, his conduct at the post office general delivery window in San Francisco, his impeachment, time and time again, were sufficient to go to the jury for the purpose of determining whether or not defendant's flight from the scene of the crime, in connection with all other testimony, tended to establish his guilt.

Flight of a person after the commission of a crime, knowing that a crime has been committed, while not of itself sufficient to establish guilt, or raise a presumption of guilt (People v. Gee Gong, 15 Cal.App. 28, 114 P. 78, 81), it is a circumstance which is to be considered by the jury in connection with all other facts and circumstances in the case as tending in some degree to prove a consciousness of guilt. People v. Fowler, 178 Cal. 657, 174 P. 892, 898; Quinn v. State, 55 Okl.Cr. 116, 25 P.2d 711, at page 715; State v. Morrison, 52 Idaho 99, 11 P. 2d 619; 22 C.J.S., Criminal Law, § 625.

Defendant contends the verdict is contrary to law for the reason the jury failed to follow the instructions of the court as to giving defendant the benefit of any reasonable doubt as to his guilt, or to reconcile the evidence on the theory of his innocence. Under this specification defendant calls attention to three alleged suspects.

 The rule is that in a criminal trial the defendant is not permitted, by way of defense, to show by conjectural inferences

that some other person might have committed the offense for which he is on trial. (State v. Moon, 20 Idaho 202, 117 P. 757, Ann.Cas. 1913A, 724; State v. Caviness, 40 Idaho 500, 235 P. 890; State v. Miller, 65 Idaho 756, 760, 154 P.2d 147; State v. Perelli, 125 Conn. 321, 5 A.2d 705, 121 A.L.R. 1357, n. 1365.) However, it might be here observed that of the three suspects, Rusho, husband of deceased, was in Pocatello, Idaho, on the date she was murdered, and the record fails to show that he was in any manner connected therewith. Reed, as the record shows, was at the Rusho home, taken there and later returned to his own home by defendant prior to the homicide. There is nothing in the record to connect Crabtree, a mechanic at the Black & White Cab Company garage, with the commission of the crime.

The granting of a new trial rests largely in the discretion of the trial court, and in the absence of a clear abuse of such discretion an order refusing to grant a new trial will not be set aside on appeal. State v. Farmer, 34 Idaho 370, 374, 201 P. 33.

It cannot be seriously contended, in the light of the record, that the trial court clearly abused its discretion in denying defendant's application for a new trial. The trial court was in a position to observe the witnesses while on the stand, their interest or lack of interest in the result of the trial, their conduct and demeanor while testifying, and was in far better position than this court to pass upon the sufficiency of the evidence, and whether or not the verdict was against the law.

We have therefore concluded that the verdict is not contrary to law, or that the jury failed to follow the instructions of the court in giving defendant the benefit of any reasonable doubt, or to reconcile the evidence on the theory of his innocence, or that the verdict is contrary to the evidence, or that the verdict was contrary to the evidence to establish defendant's guilt beyond a reasonable doubt; that there was sufficient substantial evidence to show motive and opportunity for defendant to commit the crime.

No reversible error appearing in the record, the judgment is affirmed, and it is so ordered.

GIVENS, HOLDEN and HYATT, JJ., concur.

MILLER, J., dissents.