674 P.2d 396

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Lacey M. SIVAK, Defendant-Appellant.**

Nos. 14435, 15022.

Supreme Court of Idaho.

Aug. 15, 1983.

Rehearing Denied Dec. 27, 1983.

Klaus Wiebe and David Z. Nevin, Boise, for defendant-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., and Larry K. Harvey, Deputy Atty. Gen., Boise, for plaintiff-respondent.

BAKES, Justice.

Appellant appeals from a sentence of death imposed by the trial court on convictions of first degree murder, robbery, and possession of a firearm during the commission of a felony.[1] Our review is not only in response to the appeal, but also pursuant to automatic review of death sentences mandated by I.C. § 19–2827.[2]

---

1. We note that this case arrived at the appellate level under the same circumstances as *State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983). The district judge filed written findings of fact and conclusions of law which were delivered to Sivak and his counsel, without benefit of an open court hearing. Because I.C. § 19–2503 and I.C.R. 43(a) require that a defendant's sentence be given in open court with the defendant and counsel present, this Court, by order issued on March 24, 1983, vacated the sentence of death and remanded to the district court for imposition of a sentence in open court. The district judge then convened court on April 4, 1983, and in open court sentenced the defendant to death. Defendant's appeal from that sentence was consolidated with his previous appeal, and the present opinion disposes of all issues now present in the consolidated cases.

2. I.C. § 19–2827 reads as follows:

"19–2827. REVIEW OF DEATH SENTENCES—PRESERVATION OF RECORDS. —(a) Whenever the death penalty is imposed, and upon the judgment becoming final in the trial court, the sentence shall be reviewed on the record by the Supreme Court of Idaho. . . .

"(b) The Supreme Court of Idaho shall consider the punishment as well as any errors enumerated by way of appeal. . . . . "

On April 6, 1981, Dixie Wilson, an attendant at a self service gas station, was discovered near death by a customer. She had been stabbed numerous times and shot several times. Evidence indicated she had also been sexually molested. She later died from her wounds.

Witnesses saw two men inside the station with Wilson shortly before the murder, one they identified as Randall Bainbridge. Appellant and Bainbridge were seen together before and after the killing.

Appellant admitted being present during the robbery and murder, but claimed he was merely an innocent bystander. He claimed he did not participate in the robbery and murder and did not carry a firearm. However, appellant's fingerprint was found on the murder weapon.

Evidence indicated appellant had previously worked at the station, was known to the victim, had expressed animosity toward her, and had called to inquire who would be on duty at the station on April 6, 1981. The gun used in the attack was found in a storage shed rented by appellant.

Appellant was convicted and sentenced to death. He appeals from his conviction for possession of a firearm, and from the sentence of death imposed on conviction for murder, robbery and possession of a firearm.

I

Initially, appellant argues that Idaho's death penalty statute, I.C. § 19–2515, is unconstitutional. We first note that a capital sentencing scheme substantially similar to Idaho's was upheld by the United States Supreme Court in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). However, appellant makes specific objection to several areas of Idaho's statute which we consider separately.

A.

■ Appellant first argues that the involvement of a jury in the capital sentencing process is mandated by the United States Constitution. He asserts that since Idaho's death penalty scheme fails to include a jury in the sentencing procedure, it is unconstitutional. The same argument was made and rejected by this Court in *State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983). We again reject appellant's argument for the same reason we rejected it in *Creech.*

In making this argument, appellant directs our attention to those United States Supreme Court cases that require death penalty schemes be consistent with "evolving standards of decency." *Gregg v. Georgia, supra; Trop v. Dulles,* 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). He argues that only the involvement of a jury can ensure that the imposition of the death penalty remains true to societal standards of decency.

However, the United States Supreme Court has never decided the question of which authority is required to decide what sentence to impose in capital cases—judge or jury. The specific question of the constitutionality of a scheme not involving a jury in the sentencing process has never been decided by that court. Indeed, the Supreme Court has recognized, in *dicta,* that *judge* sentencing should lead to greater consistency in sentencing, which is one of the ultimate goals in the capital sentencing scheme.

> "This Court has pointed out that jury sentencing in a capital case can perform an important societal function, . . . but it has never suggested that jury sentencing is constitutionally required. And it would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases." *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), *reh. den.* 429 U.S. 875, 97 S.Ct. 198, 50 L.Ed.2d 158 (1976).

The values possessed by a particular community, which should somehow be reflected in a capital sentencing scheme, are ade-

quately represented by the elected representatives of the community, who enact the local death penalty statutes. Their representative status, coupled with the considered judgment of an elected trial judge as the sentencer, should assure both consistency in the application of the death sentence and adequate reflection of community values. We see no reason why a sentencing scheme not involving the jury should be declared unconstitutional under the United States Constitution. *See Barclay v. Florida,* —— U.S. ——, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983) (where jury recommended life sentence, trial judge fully justified in overruling jury and imposing death sentence).

### B.

■ Although not alleged by appellant here, an argument has been made that Idaho's present sentencing scheme, excluding the jury, violates the Idaho Constitution. While normally we would not consider arguments not raised by the parties, capital cases present an exception to that rule in that we are required by law to conduct an independent review of cases where the death penalty has been imposed. I.C. § 19–2827. We now proceed to consider whether the present I.C. § 18–4004 and I.C. § 19–2515, as a sentencing scheme, violate the Idaho Constitution.

Our state constitution was drafted August 6, 1889, and adopted by the people in November of 1889. Art. 1, § 7, of that constitution reads: "§ 7. RIGHT TO TRIAL BY JURY.—The right of trial by jury shall remain inviolate ...." This section has been interpreted in several of our cases as guaranteeing the right to trial by jury as it existed at the time of the adoption of the Constitution. *See People v. Burnham,* 35 Idaho 522, 207 P. 589 (1922); *Christensen v. Hollingsworth,* 6 Idaho 87, 53 P. 211 (1898). Thus, to determine what right is preserved, it is necessary to determine what right existed at the time of enactment of the Constitution.

The tracing of the sentencing function in capital cases begins with the 1864 Criminal Practice Act, which, although not in effect at the time of enactment of the Constitution, was an immediate predecessor of the section in effect in 1889. The 1864 section read:

"[T]he jury before whom any person indicted for murder shall be tried, shall, if they find such person guilty thereof, designate by their verdict, whether it be murder of the first or second degree .... Every person convicted of murder of the first degree, shall suffer death ...."

Under the 1864 section, the jury, in determining the crime committed, in effect chose the sentence to be imposed. A similar procedure existed in the 1887 enactment, 1887 R.S. § 6563. It read:

"Every person guilty of murder in the first degree shall suffer death, and every person guilty of murder in the second degree is punishable by imprisonment in the Territorial prison not less than ten years, and the imprisonment may extend to life."

Thus, if a person was found guilty of first degree murder, the penalty was death. However, if a person was found guilty of second degree murder, the sentencer was invested with the discretion to set a term of imprisonment from ten years to life. That sentencer was the judge, and not the jury. *See* 1887 R.S. § 7992 (where discretion is conferred upon the court, the court will hear evidence in aggravation or mitigation of the punishment).

Under the scheme that existed at the time of the adoption of the Idaho Constitution, the jury determined whether a person was guilty of first or second degree murder. Once the degree of crime was determined, the jury's factfinding function was completed. It is certainly true that the jury's decision had an impact on the sentence which was imposed. Thus, if the jury determined that the defendant was guilty of only the crime of second degree murder, no death penalty could be imposed. However, that is only an incidental consequence which is true in every case where a jury finds a defendant guilty of a lesser included offense from that with which the defendant is

charged. Thus, if a defendant is charged with first degree burglary, and the jury finds him guilty of second degree burglary or perhaps petit larceny, the jury's determination will have a substantial impact upon the sentence which is imposed upon the defendant. However, that does not mean that under our Constitution a defendant is entitled to have a jury impose the sentence. While the jury's determination of the crime of which the defendant was guilty affects the sentence which may necessarily be imposed, that incidental effect does not mean that the jury is an integral part of the sentencing process. The argument that is made that R.S. § 6563, in effect in 1889 when the Idaho Constitution was adopted, constitutionalized a right to be sentenced by a jury in capital cases, basically misconstrues the distinction between the factfinding function of determining the degree of crime of which the defendant is guilty performed by the jury, and the sentencing function which is to be performed by the court. Accordingly, we conclude that Art. 1, § 7, of the Idaho Constitution does not require the participation of a jury in the sentencing process in a capital case.

### C.

■ Appellant also asserts that I.C. § 19–2515(f)(8) is unconstitutionally vague. Again, somewhat the same argument was made by the appellant in *State v. Creech, supra.* In *Creech,* the appellant argued that I.C. § 19–2515(f)(8) was unconstitutionally vague. In that case, this Court construed "propensity" in such a way as to narrow its meaning so that it could not possibly be interpreted to apply to every murder coming before a state trial court.

"We would construe 'propensity' to exclude, for example, a person who has no inclination to kill but in an episode of rage, such as during an emotional family or lover's quarrel, commits the offense of murder. We would doubt that most of those convicted of murder would again commit murder, and rather we construe the 'propensity' language to specify that person who is a willing, pre-disposed killer, a killer who tends toward destroying the life of another, one who kills with less than the normal amount of provocation. We would hold that propensity assumes a proclivity, a susceptibility, and even an affinity toward committing the act of murder." *State v. Creech, supra,* 670 P.2d at 471–472.

Thus, appellant can no longer claim that (f)(8) is unconstitutionally vague because of this limiting construction placed on it by this Court. *See Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). However, he does attempt to make a somewhat different argument concerning the constitutionality of this section. He argues that the presence of the word "probably" allows a trial judge to find an aggravating circumstance based on less than a reasonable doubt, in contravention of our opinion in *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981).

I.C. § 19–2515(f)(8) reads:

"19–2515. INQUIRY INTO MITIGATING OR AGGRAVATING CIRCUMSTANCES—SENTENCE IN CAPITAL CASES—STATUTORY AGGRAVATING CIRCUMSTANCES—JUDICIAL FINDINGS.—...

. . . .

(f) The following are statutory aggravating circumstances, at least one (1) of which must be found to exist beyond a reasonable doubt before a sentence of death can be imposed:

. . . .

(8) The defendant, by prior conduct or conduct in the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society."

For a trial judge to rely on (f)(8) as an aggravating circumstance in the imposition of the death penalty, he must find *beyond a reasonable doubt,* that the defendant exhibits such propensity.

Reading (f)(8) in its entirety, we fail to see how it can be reasonably argued that the statute could be interpreted to require only a finding based on the preponderance of the evidence, rather than beyond a rea-

sonable doubt, as it expressly states. Furthermore, the trial judge expressly stated that he found the circumstance to exist beyond a reasonable doubt. He also noted:

> "The defendant, both by prior conduct and conduct in the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society. It is impossible for this court to believe that society will ever be safe while this defendant remains mobile and active."

The interpretation that appellant urges is contrary to the clear wording of the statute. I.C. § 19–2515(f)(8) merely requires a finding, beyond a reasonable doubt, of the existence within a defendant of a propensity to commit murder likely to cause a threat to society. Thus read, (f)(8) is not unconstitutionally vague.

Appellant also argues that I.C. §§ 19–2515(f)(5) and (f)(6) are unconstitutionally vague. In *State v. Osborn, supra,* and *State, v. Creech, supra,* we considered these arguments and placed limiting constructions on these sections so as to eliminate any possible vagueness. We need not consider those arguments again here.

### D.

■ Appellant also argues that I.C. § 19–2515(d) is unconstitutional because it does not require the trial judge to find that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. Again, a similar argument was considered and rejected in *State v. Creech, supra.* Appellant confuses the standard applicable to proof of an aggravating circumstance with the weighing process that must occur whenever any sentence is imposed.[3] As noted by the Eleventh Circuit recently:

"[Appellant's argument] ... seriously confuses proof of facts and the weighing of facts in sentencing. While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard, ... the relative *weight* is not. The process of weighing circumstances is a matter for judge and jury, and, unlike facts, is not susceptible to proof by either party." *Ford v. Strickland,* 696 F.2d 804 (11th Cir.1983).

The "beyond a reasonable doubt" standard applies to the existence of aggravating circumstances, not to the process of weighing them against the mitigating circumstances, which must occur before sentence is imposed. *Gray v. Lucas,* 677 F.2d 1086 (5th Cir.1982), *reh. den.* 685 F.2d 139 (5th Cir. 1982). *See Zant v. Stephens,* —— U.S. ——, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (where United States Supreme Court upheld the Georgia sentencing scheme which provided that, by a finding of a statutory aggravating circumstance beyond a reasonable doubt, the defendant was eligible for the death penalty, and therefore *all* evidence is to be considered, and it is within sentencer's discretion to balance aggravating and mitigating circumstances, not pursuant to any special standard. *Barclay v. Florida, supra* (where Florida statute provided for weighing statutory aggravating circumstances against mitigating circumstances not pursuant to any special standard for the weighing process, statutory scheme approved). Appellant's argument has no merit.

### II

Appellant also makes several assertions concerning the findings and conclusions of the trial court. He asserts that the court relied on non-statutory aggravating circumstances,[4] that some of the findings were

---

**3.** We note that in *State v. Wood,* 648 P.2d 71 (Utah 1982), the Utah Supreme Court held that the trial judge must find aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. However, they so ruled in interpreting their own statutory scheme and not on the basis of federal or state constitutional principles. *Id.* at 82. We note

that Utah's capital sentencing scheme is somewhat different from Idaho's. We find the reasoning in that case to be unpersuasive.

**4.** I.C. § 19–2515(f) sets out the statutory aggravating circumstances to be considered by a trial judge in sentencing.

unsupported by the evidence, that some of the findings are inconsistent with the jury's verdict, and that some are incomplete under *State v. Osborn, supra.* We will consider each of these assertions separately.

### A.

██ Appellant argues that the court erred in its consideration of non-statutory aggravating circumstances. It appears that the trial court used the same type of format in its written sentencing decision as that used in *State v. Creech, supra.* The findings of the court are divided into sections, with the individual sections labeled differently:

"4. Facts and Argument Found in Mitigation.

. . . .

"5. Facts and Argument Found in Aggravation.

. . . .

"6. Statutory Aggravating Circumstances Found Under Section 19–2515(f), Idaho Code. These aggravating circumstances are all found by this court to be beyond a reasonable doubt."

Appellant argues that a trial court's consideration of nonstatutory aggravating circumstances creates both statutory and constitutional problems. We previously ruled in *Creech* that a trial court is not limited as to the aggravating circumstances it may consider. It is also clear from our opinions in both *Creech* and *Osborn, supra,* that a trial court, while it may consider all relevant circumstances in a particular case, must find at least one *statutory* aggravating circumstance to exist beyond a reasonable doubt. This satisfies the constitutional requirement of notice. Since the trial court expressly found four of the *statutory* aggravating circumstances to exist beyond a reasonable doubt, the sentence was not imposed in violation of any of appellant's constitutional rights.

### B

██ Appellant cites two of the trial court's findings and argues that they are not supported by the evidence. The allegedly objectionable findings are:

"5. . . .

"a. . . . The defendant dominates his co-defendant, and is primarily responsible for all that occurred.

. . . .

"6. . . .

. . . .

"d. The defendant, both by prior conduct and conduct in the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society."

The evidence before the trial court was more than sufficient to sustain both of these findings. An in-depth interview of appellant's accomplice was conducted, and was included in the presentence report. It contains references to the relationship between the two, lending support to finding 5a. Finding 6d is supported by evidence of the brutal murder committed by this defendant, by his lack of remorse, willingness to participate in the crime, and by testimony of his prior offer to do violence to and, inferentially, to kill another person other than Dixie Wilson. Because these findings are supported by the evidence, we will not disturb them.

### C.

██ The jury instructions given in the present case, taken from the information, set forth two alternatives for the jury. In Count II, the state alleged that appellant should be found guilty of first degree murder because the crime was committed with premeditation and malice aforethought. Count III alleged that appellant was guilty of first degree murder because the crime was committed during the course of a robbery. The jury, in returning its verdict, acquitted appellant of Count II and convicted him of Count III. Appellant now alleges that several of the district court's findings are inconsistent with the jury's verdict. The findings cited by appellant are:

"That the defendant knew the victim . . . and realized that she could identify him if she were left alive after this robbery.

. . . .

"He apparently was mentally cool and collected, with the murder being an intentional rational act.

. . . .

"After the robbery commenced the defendant realized the victim could identify him if she were left alive after this robbery."

The findings of the trial judge in sentencing are based not only on what he has heard during the trial, but also on the information he gathers from many other sources. A trial court's duty to tailor a sentence to an individual defendant necessitates access to a wide range of information about that defendant. *State v. Johnson,* 101 Idaho 581, 618 P.2d 759 (1980). This is especially true in cases involving the possible imposition of the death penalty, wherein the United States Supreme Court requires that the sentence be determined according to the requirements of each individual case. *See Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). The trial judge in the present case received an abundance of information during the sentencing portion of defendant's trial concerning the character of the defendant and his possible inclination. The trial judge thus issued his findings based on his access to this broad range of information. The jury did not have access to the same amount of information in returning its verdict. Thus, the findings of the jury, and the findings of the trial judge, are not inconsistent; rather, they are based on different ranges of information. We see no error in the trial judge's findings on this issue.

### D.

■ Appellant also argues that the findings of the district judge were incomplete and inconsistent in light of our opinion in *State v. Osborn, supra.* In *Osborn,* we placed limiting constructions on I.C. §§ 19–2515(f)(5) and (6). Appellant argues that the trial judge's findings do not affirma-

tively show that he used those limiting constructions in making his findings on those specific circumstances. Appellant seems to argue that a trial judge should be required to specifically set forth findings on the limiting constructions themselves. Trial judges are required by I.C. § 19–2515 to find at least one statutory aggravating circumstance beyond a reasonable doubt. The limiting constructions placed upon these statutory circumstances in *Osborn* were set forth to provide a definitional aid to trial judges attempting to apply the circumstances to the particular facts of the case they are considering. There is no directive in either the statute or *Osborn* requiring a trial court to set out the specific language used in *Osborn* before this Court will uphold that court's findings. The findings made by the trial court in this case sufficiently comply with the standards set out in I.C. § 19–2515(f), *State v. Osborn, supra,* and *State v. Creech, supra.*

### III

■ Appellant asserts error in the inclusion in the presentence report of a psychiatric evaluation. This evaluation, drawn up by Dr. John Stoner, resulted from a pretrial meeting between Dr. Stoner and appellant, arranged by appellant's counsel, during the investigation of the propriety of a defense based on mental disease or defect. The evaluation was paid for by appellant's family, and never offered in evidence during trial. Appellant argues that the evaluation formed the basis of the presentence investigator's report, but was used in violation of appellant's attorney/client privilege, his psychologist/patient privilege, and his fifth, sixth and fourteenth amendment rights. Without deciding whether use of such material would violate any of appellant's rights, we note that upon motion by defense counsel the trial judge expressly refused to consider the evaluation in his sentencing decision, and references to the evaluation were stricken from the presentence report. The record shows that the trial judge made the following comments:

"And the Court, for the record, has had all the reports sanitized by recovering

this psychiatry report, so none of the three of us have read these particular items.

. . . .

"I will order that the presentence report remain sanitized as done so that the Court and both counsel are not aware of the report of Dr. Stoner. And I will not take the report of Dr. Stoner into account in the course of this sentencing. Motion granted."

Thus, the trial court specifically said that he had not read the report or references to it, and specifically declined to take the report into consideration in sentencing. We will not presume error when the record, on its face, militates against such a conclusion. Appellant's argument, that the presentence investigator took the report into consideration in preparing the presentence report, and that it affected the report and thus influenced the sentencing judge, is without merit.

### IV

Appellant also argues that he was improperly convicted of the crime of possession of a firearm during the commission of a felony, and that a death penalty entered in conjunction with such a conviction cannot stand where the possession conviction was obtained based on instructions which did not comport with this Court's decision in *State v. Thompson,* 101 Idaho 430, 614 P.2d 970 (1980).

In *Thompson,* which was released prior to appellant's trial, we ruled that a person could not be convicted under I.C. § 19–2520, the possession statute, unless it is shown that the defendant is the person who actually used the gun. The statute cannot be used to convict a person who was merely an aider or abettor. Appellant urges that, upon proper instructions, the jury could have found that he was merely an aider or abettor, and never actually possessed the weapon.

The trial judge gave the following instruction concerning the possession charge:

"If you find the defendant guilty of any of these crimes it then will become your duty to determine whether or not, in that crime, the defendant carried, displayed, used, threatened, or attempted to use a firearm or other deadly weapon while committing the crime."

■■■■ We feel that this instruction adequately informed the jury that, to convict the appellant, he must have "carried, displayed, used, threatened, or attempted to use" a firearm in the commission of a felony. There was sufficient competent evidence upon which to base a finding of actual possession by the appellant. The instruction being adequate, we will not disturb the conviction on that charge.

Pursuant to our independent review in death penalty cases, I.C. § 19–2827 requires us to conduct a review of the record to determine if this particular death sentence resulted from any arbitrary factors, such as passion or prejudice. That section also requires us to determine if the sentence imposed in this particular case is excessive or disproportionate to sentences imposed in similar cases. Our independent review of this case does not reveal any indication of existence of arbitrary factors. Our review of similar cases involving the death penalty, while necessarily limited by the lack of such cases, as noted in *State v. Creech, supra,* does not reveal the presence of any particular excessiveness or disproportionality in this particular case. The heinous nature of the crime committed in this case, and the nature and character of the defendant, makes the imposition of the death penalty in this case both proportionate and just.

The judgment of conviction and sentence imposed are affirmed.

DONALDSON, C.J., and SHEPARD, J., concur.

BISTLINE, Justice, dissenting.

In *State v. Creech,* 105 Idaho 362, 670 P.2d 463 (petition for rehearing filed May 23, 1983), I expressed a strong concern with a majority opinion which refused to discuss the view of Justice Huntley who in

dissent pointed out that our Idaho Constitution guarantees that no person shall be executed except on direction of a jury. In today's opinion the same majority, now deigning to discuss that issue, and completely ignoring that written by Justice Huntley and by myself in *Creech*, rationalizes around the research which we there presented by noting the absurdity that it was the judge who was the sentencer where the jury convicted an accused of *second degree murder*—but at the same time facetiously conceding "that the jury's decision had an impact on the sentence which was imposed." This is pure sophistry at its best. The jury, if it convicted the accused of first degree murder thereby sent the accused to the gallows. That is an *impact* indeed. As stated in my *Creech* dissent:

"In *People v. Walters,* 1 Idaho 271 (1869), the defendant was charged with murder in the first degree. The jury, *knowing that a first degree conviction required execution,* recommended the mercy of the court.

" 'We the jurors in the above entitled cause find the Deft guilty as charged in the Indictment and recommend him to the mercy of the court.

L. Jackson
Foreman of Jury' "

It cannot in good conscience be argued that from 1869 until *Furman* it was not the jury which made the life or death decision. Any lingering doubt as to the intention of the legislature should be dispelled by simply observing that following the 1911 Amendment to I.C. § 18–4004[1] the courts of Idaho, including this Supreme Court, continued to acknowledge the jury's function as sentencer, as was carefully documented in my dissenting opinion in *Creech* wherein were set forth verbatim the jury verdicts in [*State v.*] *Hoagland* [39 Idaho 405, 228 P. 314 (1924)], [*State v.*] *Reding,* [52 Idaho 260, 13 P.2d 253 (1932)], [*State v.*] *Van-*

*Vlack,* [57 Idaho 316, 65 P.2d 736 (1936)], [*State v.*] *Golden,* [67 Idaho 497, 186 P.2d 485 (1947)], *Owen, Clokey,* [*State v.*] *Gonzales* [92 Idaho 152, 438 P.2d 897 (1968)], and *Buckley*—which latter was the last first degree murder to be reviewed in this Court under the law as it existed prior to *Furman*'s advent.

Regrettably one must conclude that the author of today's opinion for the Court has yet to read my *Creech* dissent. Nothing in today's majority opinion supports its bald conclusion "that Art. 1, section 7, of the Idaho Constitution does not require the participation of a jury in the sentencing process in a capital case." The best that can be said for the majority opinion is that it does recognize that where the jury convicts of second degree murder, "no death penalty could be imposed," but this is said to be an incidental effect. Some may consider it a deplorable state of affairs that in a matter of such grave moment the majority does not even attempt to comment upon the proceedings of the Constitutional Convention and the remarks of Mr. Heyburn, Mr. Claggett, and Mr. Ainslie in the drafting of Art. 1, section 7—which was thereafter adopted by the people. Instead the majority digresses into the wholly irrelevant field of the judge's discretion where the jury's verdict was to convict of murder in the *second* degree.

With equal facility the majority facilely avoids discussing the teaching of *State v. Miles,* 43 Idaho 46, 248 P. 442 (1926), or attempting to explain away the words and wisdom of Justice Ailshie in *In re Prout,* 12 Idaho 494, 86 P. 275 (1906). Instead the majority opinion speaks of the sentencing discretion in, of all things, burglary cases. It gives us the remarkable pronouncement that the jury's determination of whether the defendant is guilty of first or second degree murder, or perhaps the included of-

1. As amended in section 18–4004, the legislature showed its understanding that the jury had been and would continue as the sentencer:

"Punishment for murder.—Every person guilty of murder in the first degree shall suffer death or be punished by imprisonment in the state prison for life, and the jury may decide which punishment shall be inflicted. Every person guilty of murder in the second degree is punishable by imprisonment in the state prison not less than ten years and the imprisonment may extend to life."

fense of petit larceny, "will have a substantial impact upon the sentence ...," and that such "does not mean that under our Constitution a defendant is entitled to have a jury impose the sentence." No one has ever contended that it did in other than murder cases; the statement of the majority only serves to show no knowledge of the documentation of the *Creech* dissenting opinions, at the best, or, at the worst, a complete disregard for the irrefutable teaching of that documentation. In an ordinary case this would be thought regrettable. In a case where we review the imposition of a death sentence, it may well be regarded as unpardonable.

Most disturbing is the knowledge that prior to *Furman* the capital death sentencing procedures in Idaho were within a small percentage of being those which the *Woodson* Court would later prescribe. Basically all that was needed, prior to *Furman,* was a bifurcation so that a person accused of first degree murder would not be prejudiced by attempting at a single trial to prove both that he did not deserve the death penalty and that he was not guilty of first degree murder—a Catch 22 situation if ever there was one. For example, *see State v. Clokey,* 83 Idaho 322, 364 P.2d 159 (1961), and *State v. Owen,* 73 Idaho 394, 253 P.2d 203 (1953), both discussed in my *Creech* dissent. Those cases, and others, make it clear that this Court earlier, and absent legislative involvement, recognized that the trial courts should properly instruct the jury in a capital case to the end that the jury did not arbitrarily or capriciously invoke the penalty of death.

Following *Woodson* the legislature set guidelines to follow, and, unfortunately believing (as the Statement of Purpose to the proposed 1977 amendment shows, set out in the *Creech* dissenting opinion of Justice Huntley) that the Supreme Court of the United States had barred juries from continuing as sentencing authorities, made those guidelines for the benefit of judges. Nonetheless, the guidelines are there, and all that is required now, primarily, is for this Court to legitimize the 1977 Death Penalty Act by declaring that a sentence of death will *constitutionally* be imposed as the judgment of twelve jurors—in whose selection the defendant played a large part—instead of being imposed by a single individual who holds the office of district judge. Alternatively, if this Court fails to follow that route, which simply encompasses a holding that wherever in I.C. § 19–2515 the word "court" appears, "court" shall be construed to mean the jury and not the judge.[2] To do so would comport with an earlier court's understanding that "[i]n all cases triable by a jury, the court is made up of the judge and the jury." *State v. Ramirez,* 34 Idaho 623, 203 P. 279 (1921) (not to be confused with *State v. Ramirez,* 33 Idaho 803, 199 P. 376 (1921)). As to the problem which I just mentioned in footnote 2, the *Ramirez* Court also noted that "[t]he words 'judge' and 'court' are frequently used as convertible terms ...." 34 Idaho at 634, 203 P. 279. This Court today would do a service to its people were it to thus put a saving gloss on the 1977 legislation. My own view, however, is that this Court will not do so—as evidenced by the illogical reasoning of the three-member majority which brings it to the conclusion that our Idaho Constitution does not give a capital defendant the right to have his fate decided by a jury. In the long-run it would be preferable if the legislature attended to the matter.[3] Meanwhile, one may be certain, a bare majority of this Court will continue to uphold judge-imposed death sentences.

Another defect in the present scheme for capital sentencing is found in I.C. § 19–2827, mentioned in my separate opinion in *State v. Osborn,* 104 Idaho 809, 663 P.2d

---

**2.** I am not unaware of the use of the words "judge" and "trial judge" in I.C. section 19–2827(c)(2) and (e)(2).

**3.** In his *Creech* opinion, Justice Huntley urged the legislature "to amend the statutes to provide for proper jury participation in order that future capital punishment cases will not be subject to this serious defect." Hopefully, the 1984 legislature will respond when it convenes in January.

1111 (1983), wherein I pointed out, as applicable here in reviewing § 19–2827:

"[T]here is a defect in I.C. § 19–2827(g) wherein and whereunder it is only required that 'The supreme court shall collect and preserve the records of all cases in which the penalty of death was imposed from and including the year 1975.'

"Collecting such records is not a difficult task, because of the automatic review provisions of I.C. § 19–2827(a). Preservation is also no problem, because the Court does keep one copy of all appellate review proceedings. My own conclusion is that the drafter had in mind a separate collection of death penalty findings and conclusions in all cases, readily available on request to district courts, prosecutors, and defense counsel. Such a collection, which we do not presently maintain as such, will indeed be a helpful tool, but I see it as virtually meaningless unless the collection includes *all* sentencing hearings held following a conviction of first degree murder. Only in this manner will this Court in making its review be able to determine 'whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.' I.C. § 19–2827(c)(3).[2] Only in this manner will sentencing authorities have established guidelines as to the state-wide norm in imposing the penalty for murder in the first degree. Only in this manner can prosecuting attorneys and defense attorneys be adequately informed as to the pulse of Idaho's people—from among whom come the jurors who decide guilt or innocence, and who constitutionally should even now be determining the sentence to be imposed. When we have provided for a proper collection, and when we have required jury sentencing—both of which are within the Court's authority to provide for—thus putting a saving gloss upon the entire procedure—the entire citizenry may profit from a sentencing procedure which is constitutionally sound.

[2] The tenor of the statute is such that I do not hesitate to express a belief that the drafter thereof *intended* the collection to include all dispositions of first degree murder convictions."

The majority in today's opinion properly states that § 19–2827 requires of our review that we determine whether "the sentence imposed in this case is excessive or disproportionate to sentence imposed in similar cases." This is as it should be. But, because of the defect in the statute above described, the majority wholly ignores the facts and circumstances in the extremely similar case of *State v. Major,* 104 Idaho 4, 665 P.2d 703 (1983). *Major* too involved a first degree murder conviction, and there the weapon was a knife only—which is considered by many more brutal and sadistic than being shot to death. The district judge in *Major* made the findings in aggravation and mitigation which are statutorily required:

"*5. Aggravation* The court finds, from the evidence, that a heinous, atrocious attack occurred upon a human being. As the state proved at the trial, and reiterated at the hearing, the killing of Tony Mesa involved injuries inflicted prior to his death, then the death injury, and brutal aggravation of the death wound. The Court finds no possible justification for the nature of the attack, and finds no evidence that the victim was armed or able to defend himself in any way.

"The Court further finds that the accused has a criminal record which extends back to 1962, and involves at least seventeen narcotics offenses. The Court further finds that, within ten years prior to this offense, the accused was convicted of a felony, second degree burglary. The defendant himself admitted commission of a felony, and the pre-sentence report shows the conviction occurred in June, 1975, in San Bernardino County, California. The Court also finds that the accused has twice been convicted of some sort of assault on another person.

*6. Statutory Aggravating Circumstances* The court finds beyond a reasonable doubt that two of the statutory circumstances set forth in Idaho Code, § 19–

2515 exist. The murder was, in the opinion of the court, 'especially heinous, atrocious or cruel, manifesting exceptional depravity.' The testimony of the autopsy pathologist graphically depicted the brutal, destructive knife attacks which were inflicted upon the victim. The nature of the wounds made it apparent that the attack virtually amounted to a series of torturing wounds which finally culminated in the massive cutting of the victim's throat. The evidence made it clear that after inflicting the throat wound, the assailant then made ripping motions with the knife which were simply mutilating in nature. There was enough bleeding from the early wounds to make it clear that the victim was seriously injured and no doubt in great pain before the final, brutal attack was made. The nature of the attack, taken in stages as it was, also clearly, and beyond a reasonable doubt, shows that the defendant, at the time of the attack, 'exhibited utter disregard for human life.' The Court therefore finds, that the circumstances set forth in Idaho Code 19–2515(f)(5) and (6) have been established beyond a reasonable doubt." R., pp. 150–51.

*Major* is exactly one of the "similar cases" referred to in I.C. § 19–2827(c)(3), and yet the majority of the Court in making their review does not consider it. How, one must ask, can a reviewing court determine whether a sentence of death "is disproportionate to the penalty imposed in similar cases" if it does not collect, preserve and refer to *all* capital cases? The majority apparently sees the matter in a different light. The statute, however, is clear that "the penalty involved in similar cases" may be the death penalty, or it may be a life sentence. Again, no argument to the contrary can in good conscience be made. Nor should it. Should the members of this Court, regardless of how § 19–2817 is read, shut their eyes to the penalty that the stabbing, slashing murderer in *Major* received? It was not a sentence of death:

"7. *Why The Death Penalty Is Not Being Imposed* This Court is of the opinion that the statutes providing for imposition of the death penalty, and for imposition of the death penalty by lethal injection are constitutional, and are necessary in our society. And, even though the Court finds the existence of two of the statutory aggravating circumstances in this case, the death penalty is not here being imposed. The line which must be crossed before the extreme penalty is imposed is a fine one, and ultimately the decision which the Court must make is a very subjective one. Here, the Court has determined that the victim was not an innocent member of society whose death grew out of no criminal conduct on his part. The court truly believes that the victim was a drug supplier who for some reason had cut off the supply to the accused. During the negotiations to resume that supply line, something went wrong, and the violence of the drug subculture erupted. Every person who lives in that sub-culture risks the same violent end which befell the victim here. The Court believes that this accused would again repeat his actions if confronted with the same set of circumstances, and thus is a danger to other human beings. But the Court also believes that the danger to innocent members of society can be avoided by incarcerating the defendant for the rest of his life. And, the sentence which the Court imposes today will accomplish such incarceration if allowed to run its proper length.

"THEREFORE the death penalty should not be imposed on the defendant for the capital offense of which he was convicted."

R., p. 152.

This is not any criticism of the trial court's conclusion in *Major*. Nor is there intended any criticism of the trial court's conclusion in Lacey Sivak's case. Nor is it to point out that the two cases standing side by side are difficult of reconciliation. It is to point out, as I intimated in comparing *LePage* with *Osborn*, as I did in *Osborn* II, that this Court, not just a minority thereof, needs to do its part in completing the death sentencing procedures so as to achieve just and

impartial death sentences which conform with notions of constitutionality.

There is, of course, yet another first degree murder case which bears even a stronger similarity to *Sivak* than *Major*. That case is *State v. Bainbridge,* No. 14544. It is inconceivable that the Court today reviews the death penalty imposed upon Sivak without any consideration of the penalty imposed upon Bainbridge. The majority opinion, while it gives mention of Sivak's co-defendant, Bainbridge, in connection with the trial court's § 19–2515 findings of aggravating and mitigating factors, Part II B of the majority opinion, wholly and, perhaps deliberately, avoids any mention of the penalty meted out to Bainbridge or of the judge's § 19–2515 findings in *Bainbridge.* Keeping in mind that the district judge who presided at Bainbridge's trial and at his sentencing was not the same district judge who presided at Sivak's trial (a point to which I will later return, time permitting), and firmly convinced that one sentence can not be reviewed without consideration of the other, following is the disposition made at Bainbridge's sentencing:

"The above defendant having been found guilty by a jury of the criminal offense of First Degree Murder which under the law authorizes the imposition of the death penalty; and the court having ordered a presentence investigation of the defendant and thereafter held a sentencing hearing for the purpose of hearing all relevant evidence and argument of counsel in aggravation and mitigation of the offense;

NOW THEREFORE the court hereby makes the following findings:

1. Conviction. That the defendant while represented by court appointed counsel was found guilty of the offense of First Degree Murder by jury verdict.

2. Presentence Report.—That a presentence report was prepared by order of the court and a copy delivered to the defendant or his counsel at least seven (7) days prior to the sentencing hearing pursuant to section 19–2515, Idaho Code, and the Idaho Criminal Rules.

3. Sentencing Hearing.—That a sentencing hearing was held on March 5, 1982, pursuant to notice to counsel for the defendant; and that at said hearing, in the presence of the defendant, the court heard relevant evidence in aggravation and mitigation of the offense and arguments of counsel.

4. Facts and argument found in mitigation.

(a) Defendant has no previous conviction for the crime of murder, or any crime of violence. His prior offenses are property related.

(b) Defendant has demonstrated a propensity to being manipulated and used by other criminals; and although he participated in these crimes, he would be unlikely to initiate or perpetrate such crimes on his own.

(c) Although he had the opportunity and the encouragement of the co-defendant to do so, defendant did not himself inflict any death threatening wounds on the victim.

5. Facts and Argument Found in Aggravation.

(a) The defendant Bainbridge was in agreement with the co-defendant Sivak relative to the purpose and intent of the crimes of robbery and murder as committed here.

(b) The defendant, along with his co-defendant, acted in utter disregard of human life, knowing the victim Dixie Wilson would have to die to prevent her identification of the persons who robbed her.

(c) Such victim was murdered in an extremely cruel, atrocious and heinous manner, manifesting exceptional depravity; and this defendant, by his willing presence, and participation in the robbery, aided, abetted and encouraged the commission of the murder; and made no effort to discourage or dissuade such co-defendant in the means or manner of its execution.

(d) Although only one person was murdered, the circumstances attending such murder created a threat to the lives of

others, including other employees of Baird Oil Company, customers of the station robbed, and other potential witnesses of the robbery who might otherwise happen to be in its vicinity.

(e) Defendant has been previously convicted of two felony crimes.

6. Statutory Aggravating Circumstances Found Under Section 19–2515(f), Idaho Code.

(a) The defendant knowingly created a great risk of death to many persons, for the reasons explained in paragraph 5(a), (b) and (d) above.

(b) The murder was especially heinous, atrocious and cruel, manifesting exceptional depravity, as discussed in paragraph 5(c) above.

(c) By circumstances surrounding the commission of the robbery and murder here, the defendant exhibited utter disregard for human life, as discussed in paragraph 5(c) above.

(d) The murder was one defined as murder of the first degree by 18–4003(d), Idaho Code, and was accomplished by the specific intent to cause the death of a human being as discussed in paragraph 5(a) above.

7. Reasons why death penalty was not imposed.

I find that the mitigating circumstances, particularly that defendant did not himself deliver any death threatening blows to the victim, outweigh the gravity of the aggravating circumstances here so as to make unjust the imposition of the death penalty on this defendant.

### Conclusion

That the death penalty should not be imposed on the defendant for the capital offense of which he was convicted."

It is difficult, if not impossible, to reconcile the two sentences. One murderer dies; the other lives. This is a classic case of the disparity in sentencing which produced *Furman* and in turn led to the second series of cases four years later wherein the Supreme Court declared that *Furman* had been misunderstood, while Idaho in the interim destroyed death penalty sentencing procedures which would today be entirely valid according to my own reading of the "threshold theory" which the Supreme Court now retreats to in *Zant v. Stephens,* —— U.S. ——, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). I am not critical of Justice Stevens' opinion—which was expected. At the same time I agree with the view of Justice Marshall that "the States may as well be permitted to re-enact the statutes that were on the books before *Furman.*" —— U.S. at ——, 103 S.Ct. at 2760. For, as I have stated and written even prior to receiving *Zant,* Idaho's procedures in capital sentencing did not lead to arbitrary and capricious imposition of death sentences. Well instructed juries would hear evidence offered in mitigation and in aggravation, and would decide between life or death. Bifurcation of the guilt phase from the penalty phase would serve to avoid undue prejudice to a defendant charged with first degree murder.

In *Godfrey v. Georgia,* 446 U.S. 420, 427, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398 (1980), the Supreme Court reaffirmed that "the penalty of death may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious fashion," and at 428, 100 S.Ct. at 1764, " 'if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty.' "

Constitutionality is not merely adhering to that which is spelled out in the Constitution, Art. 1, section 7, but includes notions of fair trial and due process. This brings me to again join Justice Huntley in decrying, as we did in *Creech,* the wholesale use of a presentence investigator's report. Nothing is to be gained by repeating that which was written in dissent in *Creech.* It will, however, lift the spirits of those who believe in a fair trial and due process to be told that in *Major* the district judge, although he obtained and delivered to defense counsel a pre-sentence report, at the sen-

tencing hearing, "heard relevant evidence in aggravation and mitigation of the offense and arguments of counsel." There is contained in the *Major* findings nothing to intimate a belief that a trial judge is at liberty to use a pre-sentence report as admissible evidence in reaching the determination that a convicted defendant will suffer death. This, too, may pass if that district judge, and all district judges, abide by the declaration of today's majority that there was no wrong in giving consideration to an ex parte interview of Sivak's accomplice—which was included in the presentence report, and by the majority is said to support finding 5(a).

It may be that I do not fully understand what is meant by "the arbitrary and capricious infliction of the death penalty." But, if I have not seen it exemplified in comparing the penalty Sivak may pay to the penalty Bainbridge will pay, then for certain I do not know what the phrase means.

Two men, Sivak and Bainbridge, were found guilty of first degree murder which was committed in the course of a planned robbery of a gas station attendant who was acquainted with both and who could have identified both individuals. The attendant, a woman but a few years older than the defendants, was stabbed twenty times and shot three times—a brutal murder if ever there was one. The two were jointly charged, as they should have been, given a preliminary hearing, and held to answer. A single information was filed charging them jointly with armed robbery, premeditated murder, and murder in committing a felony of robbery, as they should have been charged. Neither made a motion for separate trial, apparently being unable to show the prejudice required by our case law, and they should have been tried together.[4] But they were not so tried. One defendant, Bainbridge, filed an affidavit of disqualification against Judge Newhouse, who thereupon disqualified himself as to Bainbridge only, for which there may or may not be

precedent in some other jurisdiction. In any event, Judge Newhouse assigned Bainbridge's trial to Judge Rowett. In that strange manner the co-defendants were not tried together as they should have been for the crimes the two of them committed, but the results of the guilt trials came out the same, as both were convicted of first degree murder. There is little doubt in my mind, after reviewing the facts and circumstances of the crimes, that had they been tried jointly and had a jury been the sentencer both would have suffered the same fate. But they were not tried together for their jointly committed crimes as they should have been, and a jury was not the sentencer as should have been the case. As it stands now, one dies and one lives. If this is not disparate sentencing, then I do not expect to ever see it.

The two co-defendants were not only bungling criminals and inept, and thus brutal murderers, but also not loyal to each other. Sivak, who testified at his trial, claimed that Bainbridge did all of the robbing and murdering while he, Sivak, was merely in the company of Bainbridge at a poor time. Bainbridge, who did not testify at his trial, gave taped statements to the investigating officers which, on his turn to talk, blamed the entire criminal activity on Sivak, Bainbridge by misadventure merely happening to be with him at the wrong time and place, as it turned out. There were no other witnesses to the crime of murder than these two defendants. The two different juries convicted both of first degree murder and robbery, Sivak testifying to his innocence, Bainbridge not taking the stand. Neither testified at the other's trial. Notwithstanding like jury verdicts the district judges involved imposed the drastically different sentences for the same crime of murder. As acknowledged in the majority opinion in Part II B, Judge Newhouse in Sivak's case made a § 19–2515 finding that "[t]he defendant dominates his

---

4. *State v. Allen,* 23 Idaho 772, 131 P. 1112 (1913); *State v. Huskinson,* 71 Idaho 82, 226 P.2d 779 (1951); *State v. Robinson,* 71 Idaho 82, 226 P.2d 779 (1951); *State v. Oldham,* 92 Idaho 124, 438 P.2d 275 (1968). *See* I.C. § 19–2106, as modified by I.C.R. 14, requiring a showing of prejudice to avoid being jointly tried.

co-defendant and is primarily responsible for all that occurred." The majority, notwithstanding the provisions of I.C. § 19–2827, makes no mention of the penalty imposed in *Bainbridge,* and strangely does not mention the complementing findings of Judge Rowett in Bainbridge's case that "[a]lthough he had the opportunity and the encouragement of the co-defendant to do so, defendant did not himself inflict any death threatening wounds on the victim," and "that defendant did not himself deliver any death threatening blows to the victim ...."

Now, a large difficulty with these two cases and the disparity in penalties imposed, is an inability to see how it would make any genuine difference which of the two defendants delivered the more telling blows, knife wounds, or shots against and into their helpless victim. The cold inescapable fact is that *they* murdered her, and that the two district judges, neither of whom ever heard Bainbridge testify as to the circumstances of the crime, and only one who heard Sivak testify, could both to a degree exonerate Bainbridge at Sivak's fatal expense is regrettably to my mind unacceptable. Moreover, it highlights the bizarre results of having two separate trials where there should have been a single trial, and drives home the importance of adhering to jury death sentencing as is a defendant's right under the Idaho Constitution.

As briefly mentioned in the majority opinion, Part II C, "[t]he jury ... acquitted appellant [Sivak] of Count II ...."

As mentioned both defendants had been charged jointly. On the morning of Sivak's trial, the prosecutor filed an amended information five minutes before court convened. This amended information named Sivak as the only defendant. The four counts remained the same except that it deleted any mention of Bainbridge. The amended information was read to the jury:

"THE CLERK: (Reading.) In the District Court of the Fourth Judicial District of the State of Idaho, in and for the County of Ada, Amended Information. The State of Idaho, plaintiff, versus Lacey M. Sivak, defendant. Jim C. Harris, prosecuting attorney in and for the County of Ada, State of Idaho, who in the name and by the authority of said State prosecutes in its behalf in proper person, comes now into said District Court of the County of Ada and gives the Court to understand and be informed that Lacey M. Sivak is accused by this information of the crime of Count 1, robbery, felony, Idaho Code 18–6501; Count 2, murder in the first degree, felony, Idaho Code 18–4001, 03(A); Count 3, murder in the first degree, felony, Idaho Code 18–4001, 03(D); and Count 4, possession of a firearm during the commission of a crime, felony, Idaho Code 19–2520, which said crimes were committed as follows to wit:

"Count 1, that the said defendant, Lacey Sivak, on or about the 6th day of April, 1981 in the county of Ada, State of Idaho, did feloniously and by means of apparent force and fear take from the immediate presence of Dixie Wilson, an employee of the Phillips 66 gas station, certain personal property, to wit, cash money, U.S. currency, the property of the Baird Oil Company which was accomplished against the will of the said Dixie Wilson, and that the defendant pointed a gun at the said Dixie Wilson, then shot and stabbed the said Dixie Wilson to death, and taking said cash money from the said Phillips 66 gas station.

"Count 2, that the said defendant, Lacey M. Sivak, on or about the 6th day of April, 1981 in the County of Ada, State of Idaho, did willfully, unlawfully, deliberately with premeditation and with malice aforethought murder one Dixie Wilson, a human being, by shooting and stabbing the said Dixie Wilson in the head and torso thereby mortally wounding the said Dixie Wilson from which she sickened and died in the County of Ada, State of Idaho, on the 6th day of April, 1981.

"Count 3, that the said defendant, Lacey M. Sivak, on or about the 6th day of April, 1981 in the County of Ada, State of Idaho, did, in the perpetration of a robbery, a felony, kill one Dixie Wilson, a

human being, by shooting and stabbing the said Dixie Wilson in the head and torso thereby mortally wounding the said Dixie Wilson from which she sickened and died in the County of Ada, State of Idaho, on the 6th day of April, 1981.

"Count 4, that the said defendant, Lacey M. Sivak, on or about the 6th day of April, 1981 in the County of Ada, State of Idaho, did carry and use a firearm, to wit, a .22 caliber revolver in the commission of the crimes alleged in Counts 1, 2, or 3 above, all of which is contrary to the form, force and effect of the statute in such case made and provided and against the peace and dignity of the State of Idaho.

"Jim C. Harris, Ada County prosecuting attorney. (End reading.)"

Sivak testified that it was Bainbridge who was the actual murderer. The jury while deliberating sent this note to the court:

"If we convict him of robbery and agree that a murder took place by one or both of the two men do we HAVE to convict him of 1st degree murder on count III, or can we convict him of second degree murder?"

R., Supp. Volume, p. 26.

and thereafter returned verdicts which found Sivak not guilty as charged in count II, but guilty as charged in counts I, III and IV.

Following that verdict, the prosecutor amended the information in Bainbridge's case to two counts only, Robbery, Count I, and murder in the commission of a felony, Count II. Thus, the prosecutor for reasons of his own, not disclosed on the record, did not give the jury any opportunity to pass upon Bainbridge's guilt on the charge of premeditated murder. Sivak had been acquitted of that charge, apparently because the jury believed his testimony. The judge, however, at sentencing on "a different range of information" nevertheless held him guilty of being the actual murderer. In my view this is not a tolerable result, something that could not have happened in

Idaho in pre-*Furman* times, and should not happen today even with the present system of sentencing. If a court can do as was here done, the legislature might as well abolish the jury function entirely—in which effort it might find some support on this Court.

For reasons stated by Justice Huntley and myself in our *Creech* opinions, which have been herein reaffirmed, I vehemently dissent from Part II C of the majority opinion which announces and embraces the theory of "different ranges of information." This novel doctrine, said to be based upon *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), opens the doors to anything that a prosecutor can persuade a presentence investigator to incorporate into his report. Here, in Sivak's case, the majority with blatant candor approves of the "in-depth interview" of Sivak's accomplice and its inclusion in the report. This "in-depth interview" of Bainbridge, who had not yet been tried at the time Sivak was being sentenced, was not an interview but a taped police and prosecutor's interrogation of Bainbridge just three days after the murder. This interrogation occurred while Bainbridge was in custody, having been interrogated the evening before by Mr. Pfeiffer and Mr. Killeen until about 8:25 p.m. at which time he was arrested, given his *Miranda* rights and booked into the Ada County Jail. Presentence Report, pp. 9–10, Police Report.

The "in-depth interview" of Bainbridge found in the presentence report took place on April 9th and was conducted by Mr. Vaughn Killeen, Mr. Dee Pfeiffer from the Ada County Prosecutor's Office, John Dutcher, deputy prosecutor for Ada County, and Officer Collins of the Garden City Police Department. The transcript of the tape is 75 pages long. No purpose would be served by setting it out, other than to demonstrate the skills of the interrogators. It suffices to say that Bainbridge did, as might be expected, attempt to exonerate himself from both the robbery and the mur-

der, and fix all blame on Sivak.[5] In the same presentence report is a four-page unsigned and uninitialed document entitled DEFENDANT'S VERSION, following which is the following direction and admonition:

"Use this page to tell in your own words what happened before, during and after the crime. Include how you felt at the time, if you had been drinking or using any drugs, and any other factors that may have caused you to commit the crime.

"This section is <u>VERY IMPORTANT</u> as it will be included in the report to give the Judge and the court an opportunity to understand your side."

Following, then, is that which presumably is Sivak's post-conviction account of what transpired at the murder scene—appearing to be consistent with his testimony, and just as equally self-serving as Bainbridge's unsworn answers to police questioning. How a district judge could divine from the two

5. As mentioned, Bainbridge did not testify at either trial. At his trial the prosecution did not offer his statement in evidence—perhaps because he denied any complicity, and perhaps because of what appears to be a *Miranda* violation.

6. "FRANK SATTLER,

produced as a witness at the instance of the State, having been first duly sworn, was examined and testified as follows:
"DIRECT EXAMINATION
BY MR. HARRIS:
"Q. Frank, would you state your full name, please, and spell your last name?
"A. Frank Sattler, S-a-t-t-l-e-r.
"Q. Mr. Sattler, how are you employed?
"A. I'm a director of the Oil Heat Institute for Southern Idaho and Eastern Oregon.
"Q. Okay. You reside here in Ada County, do you?
"A. I do.
"Q. Can you describe what that association is?
"A. It is an association of all the dealers in Southern Idaho in which markets petroleum products.
"Q. Were you employed in that capacity on and after April 6th of this year, 1981?
"A. I was.
"Q. Do you recall the incidents as reported in the press that occurred on April 6th, 1981 at a gas station owned by Claud Baird here in Boise?
"A. I do.

sources of evidence, to wit, the sworn and unsworn statements of Sivak as against the unsworn statements of Bainbridge, who was telling the truth, if either, is beyond my powers of comprehension. As I have said, the two should have been tried at one time, and a jury should have decided their fate. I find it intolerable that for the same brutal murder which juries have found were committed by both, our system of criminal justice results in vastly differing penalties for the two offenders.

I am also greatly troubled by some of the testimony that was offered and accepted at the "live" portion of Sivak's sentencing hearing. In particular, there was little reason or justification for the prosecutor to put on the stand a Mr. Frank Sattler. His testimony, in my view, transgresses beyond that which a sentencing jury, or judge, should hear—having nothing to do with the circumstances of the crime, or the character of the defendant.[6] If any one private citi-

"Q. What I would like you to do, Mr. Sattler, if you would, is just describe the ramifications throughout your industry that were felt based upon that criminal act on that day.
"A. I didn't bring my notes. I don't recall the exact dates, but shortly thereafter we had a meeting at my home concerning the murder of Dixie Wilson.
"Q. What kind of people attended that meeting?
"A. Well, the Stinker service chain was represented, the Shell service station, the Husky, the American Oil—I think all the major service station owners were at the meeting.
"Q. All right. Go ahead.
"A. And at the meeting Mr. Baird briefed the people that were there on what he had found at his particular station.
"Obviously, the emotions were quite high. And the meeting progressed as to what action, if any, we could take to prevent future occurrences and just how we could protect our people, frankly.
"Q. What kind of feelings resulted from that crime as were evidenced by the retail dealers in Ada County at that time?
"A. Well, several of the people that were there had—their employees had expressed to them the desire to take weapons to work with them. We discussed that at length and ruled it out with the obvious intent that somebody innocent would get hurt.
"We went to the manuals to find whatever safety devices were available to us, which some have been installed, like, bullet-proof glass and

zen can be allowed to advise the sentencer to impose the death penalty, then why not fifty such witnesses? Or five hundred, or the entire community? And, here, is it not to be legitimately presumed that the prosecutor called this particular witness knowing

or believing that the witness could and would be the deciding factor when the judge made his determination. Who is to say it was not the swinging factor?

And, was it proper to place the victim's husband, Harry Wilson [7] on the stand and

the like in those stations when the teller is inaccessible to the people.

"But where the teller is accessible, we can't use that, obviously.

"Q. All right. What kind of people generally are tellers in gas stations in this community?

"A. The cashier types are primarily housewives trying to make a few extra dollars.

"Q. Would you say that they are vulnerable to this type of criminal activity?

"A. Totally vulnerable.

"Q. Mr. Sattler, if you were in a position to pass down a sentence in this case, what would that sentence be?

"A. My personal opinion?

"Q. Yes.

"A. I'd hang him.

"MR. HARRIS: That's all I have Judge."
"CROSS–EXAMINATION
BY MR. KEHNE:

"Q. Mr. Sattler, do you know anything about the facts of the case other than what was reported in the press?

"A. Nothing.

"Q. You don't know who actually killed Dixie Wilson, do you?

"A. I do not. Other than what was reported in the press and what the Court found.

"Q. Were you aware that the jury acquitted Mr. Sivak for premeditated murder?

"A. Was I aware of that?

"Q. Yes.

"A. No, I don't recall reading that.

"Q. Would that change your opinion?

"A. Negative.

"Q. You don't think it is something that should be considered?

"A. I wouldn't—I don't consider taking a human life as something that just—

"Q. He was acquitted of that, Mr. Sattler.

"MR. HARRIS: I object, Your Honor. He wasn't acquitted of that.

"THE COURT: Well, it's cross-examination. You may proceed, Mr. Kehne.

"Q. BY MR. KEHNE: About how many robberies have there been in gas stations around this valley in, say, the last three years?

"A. I don't keep the statistics on that.

"Q. How often does it happen; can you give me an approximation?

"A. I think we probably average about two a month. I think Mr. Harris probably has the statistics on that."

7.          "HARRY R. WILSON

produced as a witness at the instance of the State, having been first duly sworn, was examined and testified as follows:

"DIRECT EXAMINATION
BY MR. HARRIS:

"Q. Mr. Wilson, try to make yourself as comfortable as you can there, and would you state your full name for the record.

"A. Harry R. Wilson.

"Q. Do you reside in Ada County, Mr. Wilson?

"A. Yes.

"Q. How long have you lived in Ada County?

"A. Since '69.

"Q. And how are you employed?

"A. For Baird Oil.

"Q. What do you do for them?

"A. I drive delivery truck.

"Q. Are you the same Harry Wilson who testified in the trial of this defendant, Lacey Sivak, in September?

"A. Yes.

"Q. Could you describe for the Court, please, Mr. Wilson, your family setting and general family life prior to April 6th, 1981?

"A. It was a pretty happy family life. Everything went pretty smooth. We had our disagreement, which anybody does, but it was a happy life.

"Q. How many children did you reside with at your residence with Dixie?

"A. Three.

"Q. How old are they now?

"A. 13, 12 and 9.

"Q. Who was the mother of those three children?

"A. Dixie B. Wilson.

"Q. I would like for you now to describe you family circumstances since April 6th, 1981.

"A. It has been a hard go. It's—we started out the day of the funeral.

"Their original father, of the two boys that we had, that was hers from a previous marriage, he stuck me with a custody suit. We was in court right after that, and I have been in court four—or five times over that.

"Q. Are those children still residing with you, however?

"A. Yes. I won my case with them; I've got them. And I've got one daughter that has been in psychiatric treatment ever since.

"Q. How old is she?

"A. She is nine.

"Q. Is that the natural daughter of both you and Dixie?

"A. Yes, that's our natural daughter.

"Q. Tell me about those problems. What kind of problems is she having?

beseech of the judge the death penalty? I believe that it was totally wrong, and here again may have been the single precipitating factor which tipped the scales. Did Harry Wilson know, any better than the judge, who it was, Bainbridge or Sivak, who was the sole heartless murderer? Or, whether it was both who struck, stabbed, and shot her to death. I am at a loss to see from this record how Harry Wilson could know that. He would learn eventually, but not then, that a second jury at a later trial would also convict Bainbridge of that same murder—but Bainbridge at the time that the prosecutor placed Harry Wilson on the stand was yet presumably innocent. Whether Harry Wilson would later ask Bainbridge's judge to execute him, too, is another question, as is so with whether the prosecutor would exercise his discretion to call Harry Wilson and Mr. Sattler to the stand in order to urge the death penalty.

Although it is again disturbing to peruse a presentence report which again, as in *Creech* includes accounts of trial proceedings, there is not present here, as there was in *Creech,* an editorial encouraging the death penalty. This Court, which has assumed the right to dictate that which shall be included in presentence reports, *see* I.C.R. 33, Idaho Judge's Sentencing Manual part V, pp. 5.1–1 to 5.2–32, should take proper steps to keep out extraneous matter, and should reconsider *State v. Moore,* 93 Idaho 14, 454 P.2d 51 (1969), with a concerned view to the remarks of Justice Huntley in Part II of his *Creech* opinion.

In *State v. Moore,* a non-capital case, where a defendant was seeking probation, this Court considered the extent to which it would allow the use of hearsay found included in presentence reports, and held in favor of such use on the basis that "even though it would not be admissible under the

rules of evidence [it] might be *of great benefit to a defendant.* We hesitate to apply unduly strict procedural requirements which would operate equally to prevent defendants from marshalling hearsay and other evidence favorable to themselves." *Id.,* 93 Idaho at p. 18, 454 P.2d 51 (emphasis added). It was a compassionate judgment when rendered. Fourteen years have since gone by, and recently the Court, differently constituted, has forgotten that the reason for the rule was to benefit defendants hoping for probation and rehabilitation. I very much doubt that any defendants convicted of first degree murder have ever sought probation. In non-capital cases the rule of *State v. Moore* has been used to the disadvantage of defendants—who would in my experience generally be better off if presentence investigation and reports were done away with. There has always been and remain yet our statutory procedure providing for the presentation of evidence in aggravation and evidence in mitigation. This has been so in pre-*Furman* cases, as documented in my *Creech* opinion. Whatever the Court decides to do in non-capital cases, and a return to the beneficent intentions of *State v. Moore* is in order, the Court simply cannot in any show of conscience continue to let capital sentencing be hinged on unsworn statements and other forms of hearsay. It is now clear that a capital case involves two trials. The first is to try the issue of the accused's guilt. If convicted, the second is to try the issue of the circumstances of his crime and the facets of his character. Common sense dictates that the second trial for his life is the defendant's more important trial. Can it be then that in Idaho we have a rule that while due process obtains at the guilt trial, anything goes at the second trial which determines the issue of life and death? Until recently, I had thought that removing the element of

---

"A. Well, she just—she couldn't accept it—this. And then she's had other problems; she has been molested twice since then.

"Q. Okay.

"A. She's just—too many things; she can't accept it.

"Her grades—schoolwork; everything has went down. All the kids went down.

"Q. Harry, if you were in a position to pass sentence on Lacey Sivak, what would that sentence be?

"A. Death.

"MR. HARRIS: That's all I have, Judge.

"MR. KEHNE: We have nothing. Thank you."

due process from the second trial was such a monstrous proposition as to be undeserving of discussion or comment. Today I find myself aligned with Justice Huntley in an effort to so convince today's unyielding majority who harken back to *State v. Moore* as authority for abolishing due process.

It is true that *State v. Moore,* in addition to safeguarding defendant's rights, relied on *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), but it is also true that thirty-four years have passed, and much has changed, particularly in the area of death penalty sentencing. If the Supreme Court of the United States, as presently constituted, can now say that it little matters that a defendant is deprived of constitutional due process when his life is the issue stake, then a great many state judges and justices are going to be both disappointed and surprised. Whatever the outcome when the validity of *Williams* is closely scrutinized, we who sit on the Idaho Supreme Court will strike a sound blow for good government and good criminal justice administration when we remember that we are also sworn to uphold the Idaho Constitution and its requirements of due process and fundamental fairness. Today, as a Court, we do not do so. Presently, insofar as the United States Constitution is concerned, I believe that under it, and the many many death penalty cases of the Supreme Court, the validity of *Williams* has wholly eroded—insofar as it denied that due process was involved in sentencing a man to death.

HUNTLEY, J., concurs.

HUNTLEY, Justice, dissenting.

I would reverse and remand for the conduct of a constitutionally proper sentencing procedure.

The sentencing procedure utilized violates both the United States Constitution and the Idaho Constitution in failing to involve the jury in the sentencing process.

The Idaho Constitution, as first approved on July 3, 1890, and as it reads today, provides in Art. 1, § 7:

"Right to trial by jury.—The right of trial by jury shall remain inviolate . . . ."

That right of trial by jury as it existed at the time our constitution was adopted provided for jury participation in the capital sentencing process. Section 17 of the Criminal Practice Act of 1864 provided in pertinent part:

"[A]nd the jury before whom any person indicted for murder shall be tried, shall, if they find such person guilty thereof, designate by their verdict, whether it be murder of the first or second degree; but, if such person shall be convicted on confession in open court, the court shall proceed, by examination of witnesses, to determine the degree of the crime, and give sentence accordingly. Every person convicted of murder of the first degree, shall suffer death; and every person convicted of murder in the second degree, shall suffer imprisonment in the territorial prison for a term not less than ten years, and which may be extended to life."

In other words, the jury, by determining whether the party was guilty of either first or second degree murder, determined whether or not the death penalty would be imposed.

In *Blue Note, Inc. v. Hopper,* 85 Idaho 152, 157, 377 P.2d 373, (1962), we stated:

"The provisions of the constitution pertaining to the right to trial by jury are construed to apply as it existed at the date of the adoption of the constitution."

*Accord: Anderson v. Whipple,* 71 Idaho 112, 227 P.2d 351 (1951); *Christensen v. Hollingsworth,* 6 Idaho 87, 53 P. 211 (1898); *Comish v. Smith,* 97 Idaho 89, 540 P.2d 274 (1975).

A detailed analysis of the reasons jury participation is mandated under both the Idaho and United States Constitutions is set forth in the separate dissenting opinions of Justice Bistline and myself in *State v. Creech,* 105 Idaho ——, 670 P.2d 463 (1983), which dissents I hereby adopt as though fully set forth herein.

BISTLINE, Justice, concurring in the opinion of HUNTLEY, Justice.

*Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), teaches in footnote 16 that the Supreme Court specifically did not address, and so reserved for another day, contentions that the federal Constitution requires jury sentencing and that Ohio's death penalty statutory procedures impermissibly deny a defendant's right to be tried by a jury. 98 S.Ct. at 2967. Hence, it is with some concern that today I read a majority opinion of this Court which declares that "the Supreme Court has recognized, in *dicta,* that *judge* sentencing should lead to greater consistency in sentencing ... *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) ...." It is, perhaps, excusable to confuse remarks of obiter dictum with remarks of a three-member plurality. I am equally concerned that today's majority opinion intimates that *Barclay v. Florida,* —— U.S. ——,103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), is also authority which should persuade us that jury sentencing is not mandated by the federal Constitution. My reading of that case discloses only that in Florida the jury's function is simply to recommend and the trial judge, who is the sentencer, is not bound by the recommendation. The Florida procedure is neither like our pre-*Furman* Idaho procedure nor like our post-*Furman* Idaho procedure. Rather obviously the majority's reliance on *Barclay* for the particular point is a grasp at something, anything, to support a declaration that "[w]e see no reason why a sentencing scheme not involving the jury should be declared unconstitutional under the United States Constitution."[1] In time the Supreme Court will recognize, as it did in *Lockett,* its obligation to provide guidance. ("The States now deserve the clearest guidance that the Court can provide; ...." *Lockett,* 98 S.Ct. at 2963.) Meanwhile, given the meaningless and misleading intimations of today's majority opinion on an issue which this Court should meet in response to Justice Huntley's well-documented *Creech* opinion, and

given the invalidity of our Idaho statute removing the jury as sentencer—as measured against our Idaho Constitution—I have again joined the opinion of Justice Huntley in this case as I did in *Creech.* The Supreme Court, however, cannot continue to reserve the question if it is to live up to the promise of *Lockett.* Ultimately it, and only it can make the final decision that something is basically wrong where a nation is divided amongst itself as to the use and utility of capital punishment. Can it be and should it be that in one nation a murderer in one state will be executed, whilst murderers in another state are not? Is a line the purpose of which is to define geographic boundaries of states to forever be the determining factor in determining whether a convicted murderer will live or suffer death? If that be so, then many will see that in and of itself as arbitrary and capricious if one considers the question as the national issue, which in reality it is. And assuming that it is wrong on a national basis that the punishment meted out to murderers differs according to State law, then where two murderers are convicted of the same crime committed in one state, is it not arbitrary and capricious that each is sentenced by a different judge?—a proposition to which I shall turn in my own dissenting opinion time permitting. It should be carefully noted that Judge Newhouse in sentencing Sivak could not consider the Bainbridge sentence—which had not been imposed. This Court, however, does have both, and is obligated to consider any disproportionality in Sivak's sentence as compared to that imposed in *Bainbridge.*

BISTLINE, Justice, dissenting from denial of petition for rehearing.

Counsel for Lacey Sivak, in his Petition for Rehearing, presents several compelling reasons why this Court should grant the petition. Among the issues presented in his petition are the following:

(1) Whether the Idaho Supreme Court has denied Sivak the opportunity to raise important constitutional questions by con-

---

1. Today's majority again, as in *Creech,* offers no response of any substance.

solidating Case No. 15022, which appealed the refusal of the trial judge to allow Sivak the opportunity to present additional evidence in mitigation of sentencing, with Case No. 14435, which appealed a decision denying Sivak the opportunity to submit additional briefing or arguments in Case No. 15022.

(2) Whether the trial court erred in refusing to hear evidence in mitigation of Sivak's sentence on resentencing in contravention of the United States Supreme Court's decision in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

(3) Whether this Court's procedure of vacating and remanding for resentencing, while purporting to retain jurisdiction, a procedure absolutely without precedent, and not provided for in rule or statute, was proper.

(4) Whether this Court's proportionality review was incomplete and constitutionally defective as the majority opinion contains no specific reference to particular cases it examined. Of discussion, there is none.

(5) Whether I.C. § 19–2827 is constitutionally defective in that it apparently only requires the Court to compare death sentences with other death sentences rather than considering those cases in which an intentional killing was involved but which did not result in imposition of death.

(6) Whether I.C. § 9–2515(f)(8) which this Court narrowly construed in *State v. Creech* in order to preserve its constitutionality could have been properly applied in Sivak's sentencing which occurred before this Court's decision in *Creech.*

(7) Whether a death sentence can be premised on a condition found to exist with a certainty less than beyond a reasonable doubt as I.C. § 19–2515(f)(8) allows as an aggravating circumstance that "The defendant ... has exhibited a propensity to commit murder which will *probably* constitute a continuing threat to society."

(8) Whether the jury instruction on criminal liability for aiding and abetting was improper when it implied that Sivak could be found guilty thereunder for possession of a firearm which is not in and of itself a crime.

(9) Whether Sivak's constitutional right to confrontation and cross-examination of witnesses was violated by the use of the unsworn and uncross-examined statement of Randall Bainbridge in a pre-sentence report for the district court's finding that "[t]he defendant dominates his co-defendant, and is primarily responsible for all that occurred," which served as a basis for the trial court's imposition of the death penalty.

(10) Whether Sivak may be punished for both robbery and for murder premised on a felony murder theory when the robbery count did not require proof of an additional fact which the murder did.

Enough of these issues are presented with excellent briefing and argument so as to at least merit consideration and discussion by the Court, and better yet, reargument.